## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FRANK ALLEN and MARIE ALLEN,** | : | **CIVIL ACTION NO. 1:04-CV-2297** |
| | : | |
| **Plaintiffs** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **SUSQUEHANNA TOWNSHIP** | : | |
| **SCHOOL DISTRICT,** | : | |
| | : | |
| **Defendant** | : | |

### MEMORANDUM

Presently before the court is a motion for summary judgment by defendant Susquehanna Township School District ("School District") on the claims of plaintiffs Frank Allen and Marie Allen (collectively, the "Allens"), alleging violations of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1491o, the Rehabilitation Act, 29 U.S.C. §§ 790-794e, the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12134, and the Fourteenth Amendment. For the reasons that follow, the motion will be granted.

## I.    Statement of Facts[1]

This case arises from a particularly tragic incident, which occurred on October 20, 2003. On that date, approximately five hours after running away from the Thomas E. Holtzman Elementary School ("Holtzman"), eleven-year-old Jaquan Rakeem Allen ("Jaquan") was struck and killed by a motor vehicle while attempting

---

[1] In accordance with the standard of review for a motion for summary judgment, the court will present the facts in the light most favorable to plaintiffs, as the nonmoving parties.  See infra Part II.

to cross Interstate 81.  (Doc. 49 ¶ 2 & Ex. 1; Doc. 66 ¶ 2; Doc. 49, Ex. 1; Doc. 68, Ex. 9 at 8, 12.)

By all accounts, Jaquan's formative years were difficult.  At an early age, he was removed from his birth-mother's home because of neglect and alleged physical abuse.  (Doc. 68, Ex. 10 at 13, 15.)  According to his foster care coordinator, Jaquan suffered significant emotional trauma as a result of his early neglect and subsequent separation from his mother and other family members.  (Doc. 68, Ex. 10 at 13, 15.)  After staying with two foster families, Jaquan was placed with the Allens, who adopted him in February 2002.  (Doc. 68, Ex. 10 at 14, 16-17.)

With the Allens, Jaquan entered the School District at Holtzman, where he initially demonstrated signs of anger and physical aggression.  He was classified by the School District as a child in need of full-time emotional support.  (Doc. 68, Ex. 5 at 40; Doc. 41, Ex. 4 at 32, 45-46.)   Based upon this classification, Jaquan was entitled to special education services and a "free appropriate public education" ("FAPE") under the IDEA.[2]  Pursuant to regulations promulgated under the IDEA, the School District created an Individualized Education Plan ("IEP") for Jaquan and periodically updated it to meet his changing needs.  (Doc. 68, Ex. 5.)  Mrs. Allen was involved in the development of Jaquan's IEPs and never raised any concerns about them.  (Doc. 68, Ex. 5; Doc. 41, Ex. 4 at 52-53.)

---

[2] See infra Part III.B.

While with the Allens and at Holtzman, Jaquan improved behaviorally and academically.  (Doc. 41, Ex. 4 at 57, 73-74; Doc. 41, Ex. 10.)  In August 2002 Jaquan's emotional support was reduced to part-time, and in April 2003 his emotional support level was reduced to the resource level.[3]  (Compare Doc. 68, Ex. 5 at 12, with Doc. 68, Ex. 5 at 27.)  At this level he was able to attend, in addition to his emotional support class, classes with non-special needs students.  (Doc. 68, Ex. 8 at 52-53; Doc. 41, Ex. 6 at 4-5.)

One of the short term objectives or benchmarks in Jaquan's most recent IEP was that "Jaquan will remain in designated areas."  (Doc. 68, Ex. 5 at 6; see also Doc. 68, Ex. 5 at 23.)  This objective, according to school teachers and officials, did not signal a concern with Jaquan leaving the school; rather, it was intended to help Jaquan to focus and to stay on task within a classroom.  (Doc. 68, Ex. 2 at 32; Doc. 68, Ex. 4 at 28-30; Doc. 41, Ex. 6 at 11-12; Doc. 41, Ex. 8 at 8-11.)  Jaquan's teachers recognized that he was easily led astray by others.  (Doc. 68, Ex. 1 at 36-37; Doc. 41, Ex. 6 at 12.)  However, he was not considered a "flight risk" (i.e., a risk to run away from school or a classroom).  (Doc. 68, Ex. 4 at 35; Doc. 41, Ex. 8 at 9.)  Indicative of his improved behavior, Jaquan learned to handle his problems in school by going to the emotional support classroom.  (Doc. 68, Ex. 4 at 35-36.)

---

[3] These reductions in Jaquan's emotional support level and the corresponding IEPs were approved by Mrs. Allen (Doc. 68, Ex. 5), and she understood that the resource level of emotional support was less restrictive than Jaquan's previous part-time level (Doc. 41, Ex. 4 at 73).

In light of his progress as well as their personal experience with him, Jaquan's adoptive parents were surprised that he ran away from school on the day of his death.[4]  (Doc. 41, Ex. 4 at 83; Doc. 41, Ex. 7 at 18.)  The Allens do not recall any instance of Jaquan running away, or threatening to run away, from anywhere. (Doc. 41, Ex. 4 at 82-83; Doc. 41, Ex. 7 at 18.)  Nor did they ever request an escort for Jaquan while he was in school.  (Doc. 41, Ex. 4 at 82.)  They allowed Jaquan to play with friends outside and to go to a friend's house and the bus stop unattended. (Doc. 41, Ex. 4 at 49-50, 69, 86-87.)

On the fateful day in question,  Jaquan went to the "work room," located in a trailer adjacent to the school's main building, for recess.[5]  (Doc. 68, Ex. 1 at 13-14; Doc. 68, Ex. 2 at 6.)  Jaquan had lost his recess privilege because he failed to secure a parental signature on his behavior folder from the previous week.  (Doc. 68, Ex. 1 at 14; Doc. 41, Ex. 12.)  Jaquan was expected to return to his emotional support room after recess in the work room, at 1:05 p.m.  (Doc. 68, Ex. 1 at 14.)  Instead, Jaquan and another student, who was sent to the work room for disciplinary reasons, decided to leave school grounds.  (Doc. 41, Ex. 12.)

---

[4] Jaquan's foster care coordinator was also surprised that Jaquan ran away from school.  (Doc. 68, Ex. 10 at 81.)  She was not aware of any previous occasions when Jaquan ran away from home or out of a classroom at Holtzman.  (Doc. 68, Ex. 10 at 80-81.)

[5] The teacher assigned to the work room did not know to expect Jaquan that day—Jaquan's emotional support teacher did not provide him with a list of her students that would be going to the work room—nor could he confirm Jaquan's presence in the work room because there was no sign-in requirement for students and he did not know Jaquan personally.  (Doc. 68, Ex. 2 at 8-10.)

Jaquan's emotional support teacher became concerned when he did not

return at 1:05 p.m.  (Doc. 41, Ex. 12.)  Teachers and staff scoured the school's

buildings and grounds, and the principal drove around the surrounding area and

went to Jaquan's and the other student's residences.  (Doc. 68, Ex. 8 at 18-23.)  At

approximately 1:30 p.m., an officer from the Susquehanna Township Police

Department ("STPD") arrived at the school to collect information relevant to the

search for the missing youth.  (Doc. 68, Ex. 6 at 6.)  While officers searched the

neighborhood, including nearby woods and the boys' homes,[6] a "BOLO," or "be on

the lookout," directive was radioed to all STPD.  (Doc. 68, Ex. 6 at 6-9, 15-16;

Doc. 68, Ex. 7 at 5-7.)  Police were informed that Jaquan was believed to have left

the school because of a disciplinary incident involving the other student, but were

not told that Jaquan was a student in need of limited emotional support. (Doc. 68,

Ex. 6 at 9-10, 14-15.)[7]  Sadly, the missing students were not found until

approximately 6:00 p.m. that evening when Jaquan was struck and killed by a

---

[6] At one point, the principal heard voices in the woods near the other
student's residence, informed the police, and personally searched in the woods for
the boys.  (Doc. 68, Ex. 8 at 21-23.)

[7] If the police had been informed that the missing students had emotional
problems or psychological problems, additional resources may have been used to
search for them.  (Doc. 68, Ex. 6 at 17; Doc. 68, Ex. 7 at 8-9.)  According to the police,
"it would have been a little more of an urgent issue with us."  (Doc. 68, Ex. 7 at 9.)  It
is likely that the police would have contacted the fire department to help search
wooded areas and possibly attempted to contact the state police to request a
helicopter equipped with a heat sensor.  (Doc. 68, Ex. 7 at 9.)

motor vehicle while attempting to cross a multi-lane highway.  (Doc. 49, Ex. 1; Doc. 68, Ex. 9 at 8, 12.)

On October 19, 2004, plaintiffs commenced the instant action against the School District.[8]  (Doc. 1.)  The complaint avers claims pursuant to 42 U.S.C. § 1983, the Fourteenth Amendment, section 504 of the Rehabilitation Act, the IDEA, and the ADA.  The School District filed the instant motion for summary judgment and the parties have fully briefed these issues.  The motion is now ripe for disposition.

## II.   <u>Standard of Review</u>

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact," and for which a jury trial would be an empty and unnecessary formality.  <u>See</u> Fed. R. Civ. P. 56(c).  It places the burden on the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief.  <u>Pappas v. City of Lebanon</u>, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); Fed. R. Civ. P. 56(e); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-57 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-89 (1986); <u>see</u>

---

[8] Plaintiffs also brought state law claims against the driver of the motor vehicle that struck and killed Jaquan.  On March 24, 2005, the court dismissed these state law claims, and the School District's cross-claims against the driver, without prejudice for lack of jurisdiction.  (<u>See</u> Doc. 18.)

also FED. R. CIV. P. 56(c), (e).  Only if this threshold is met may the cause of action

proceed.  Pappas, 331 F. Supp. 2d at 315.

### III. Discussion

Section 1983 of Title 42 of the United States Code offers private citizens a

means of redress for violations of federal law by state officials.  See 42 U.S.C. § 1983.

The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United States or
> other person within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress . . . .

Id.; see also Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95

F.3d 1199, 1204 (3d Cir. 1996).  To establish a civil rights claim, the plaintiff must

show a "deprivation" of a constitutional or statutory right by a person "acting under

color of state law."[9] Id. (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d

Cir. 1995)).

In the matter *sub judice*, the Allens invoke § 1983 to raise Fourteenth

Amendment due process claims against the School District.  They also allege

violations of the IDEA, the Rehabilitation Act, and the ADA.  The court will

consider these claims *seriatim*.

---

[9] The School District does not contest the allegation that it was "acting under
color of state law."

## A.      **Fourteenth Amendment Claims**

The Due Process Clause of the Fourteenth Amendment guarantees that individuals will not suffer harms at the hand of state officials.  In the case *sub judice*, the Allens allege that the School District violated their Fourteenth Amendment rights by failing to provide the necessary monitoring of Jaquan's movements, resulting in his elopement from school and eventual death.  However, "a state has no affirmative obligation to protect its citizens from the violent acts of private individuals."  Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 907 (3d Cir. 1997).  The Allens assert that two exceptions to this general rule[10]—the "state-created danger" and "special relationship" exceptions—apply to the instant case.  See id.

### 1.      **State-Created Danger Exception**

Under the state-created danger exception to the general rule that a state is under no obligation to protect citizens from private harms, a state actor will be liable for such harms if:

(1)      the harm ultimately caused was foreseeable and fairly direct;

(2)      the state actor acted in willful disregard for the safety of the plaintiff;

---

[10] In its written submissions, the School District squarely addressed plaintiffs' Fourteenth Amendment claims alleging that the School District's policy, practice, or custom and failure to train its employees resulted in Jaquan's death (see Doc. 1 ¶¶ 41-42), but plaintiffs did not present any counter-arguments or otherwise acknowledge these claims in their brief in opposition.  (Compare Doc. 41 at 17-21, with Doc. 68.)  Abandonment of a position is tantamount to waiver of the claim, and judgment is appropriate.  See D'Angio v. Borough of Nescopeck, 34 F. Supp. 2d 256, 265 (M.D. Pa. 1999); L.R. 7.6.  Accordingly, the court will grant summary judgment in favor of the School District on these claims without further discussion.

     (3)      there existed some relationship between the state and the plaintiff;[11] [and]

     (4)      the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur.

Id. at 908 (citing Kneipp, 95 F.3d at 1208).

With respect to the first prong—the harm ultimately caused was foreseeable and fairly direct—the Allens argue only that: "The ultimate harm (which followed [Jaquan's] predictable elopement from the school premises) was foreseeable and fairly direct." The court finds this single, conclusory statement insufficient to establish the first prong, and, in any event, this assertion is belied by the evidence of record. Indeed, the Allens and Jaquan's foster care coordinator indicated that Jaquan's elopement from school was a surprise. No risk of running away was identified in Jaquan's IEP. Nor did the Allens express such a concern to the school. Therefore, a reasonable jury could not find that the harm was foreseeable.

Nor could a reasonable jury find that the harm was "fairly direct." The harm—caused by Jaquan's failed attempt to cross a multi-lane interstate highway—occurred at 6:00 p.m., three hours after school had let out for the day, and five hours after Jaquan's elopement. This harm was too attenuated from, and unrelated to, any alleged lack of supervision to be a fairly direct or foreseeable result of the school's actions. See Gremo v. Karlin, 363 F. Supp. 2d 771, 784 (E.D.

---

[11] Because the court finds that plaintiffs cannot satisfy the other three prongs of the state-created danger theory, the court will assume, without deciding, that there was a relationship between Jaquan and the School District sufficient to satisfy this element.

Pa. 2005) (citing <u>Morse</u>, 132 F.3d at 908-09).  The harm was the result of an unfortunate decision to cross the highway; a decision that Jaquan could have made whether he ran away from school, home, the bus stop, or a friend's house.  Accordingly, a reasonable jury could not conclude that this tragic incident was foreseeable or fairly direct.

Even assuming, *arguendo*, that Jaquan's death was foreseeable and direct, the evidence of record does not establish the second prong of the state-created danger exception—that the School District "acted with willful disregard for or deliberate indifference" to Jaquan's safety.[12]  <u>Morse</u>, 132 F.3d at 910.  To satisfy this prong, the Allens must demonstrate that the School District's actions "evince[d] a willingness to ignore a foreseeable danger or risk."  <u>Id.</u>; <u>see also</u> <u>id.</u> ("Of course, the notion of deliberate indifference contemplates a danger that must at least be foreseeable.").  However, the Allens point only to the goal of "remain in designated areas" in Jaquan's April 2003 IEP, arguing that this goal demonstrates a foreseeable risk that Jaquan would leave school grounds.[13]  The court is unpersuaded.  The

_____

[12] Generally, to establish a substantive due process violation, a state's action must "shock the conscience." <u>Gremo</u>, 363 F. Supp. 2d at 788 (citing <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 846 (1998)).  However, when a state actor has "the luxury of acting in a deliberate manner," as alleged in the instant matter, the deliberate indifference standard applies.  <u>Id.</u>

[13] Plaintiffs also argue that the risk was foreseeable because Jaquan's emotional support teacher was overwhelmed by and unable to handle her students.  However, the Allens offer no evidence that Jaquan ever ran away from the emotional support classroom and it is undisputed that Jaquan did *not* run away from that classroom on the day of his death.

10

undisputed evidence reveals that the goal in question related to Jaquan remaining

on task.  It was not intended to address any propensity to wander away from school

grounds.  There is no evidence that Jaquan had ever left school property without

permission or that he was ever considered a flight risk.  To the contrary, the

testimony of record indicates that the Allens and Jaquan's foster care coordinator

were taken aback by Jaquan's elopement.  As previously noted, the Allens

permitted Jaquan go to the bus stop and play with friends unattended.

Accordingly, a reasonable jury could not find that the School District willfully

disregarded or was deliberately indifferent to a foreseeable risk.[14]

Nor have the Allens established the fourth prong for the state-created danger

exception.[15]  Under this prong, "the dispositive factor appears to be whether the

state has in some way placed the plaintiff in a dangerous position that was

foreseeable, and not whether the act was more appropriately characterized as an

affirmative act or an omission."  Id. at 915.  As discussed supra, the harm that

occurred was not foreseeable.  Jaquan was not in a worse position or more

---

[14] Although plaintiffs do not argue this point, the court also finds that the school was not deliberately indifferent when it failed to inform the police that Jaquan was an emotional support student.  Within minutes of his absence from the emotional support classroom, the school contacted the police to help locate the missing boys.  In addition, the school's principal aided the police, personally searching nearby neighborhoods and wooded areas.  At most, the failure to inform the police of Jaquan's status was negligent.  However, "merely negligent acts cannot support a claim under the state-created danger theory."  Morse, 132 F.3d at 911.  See Morse, 132 F.3d at 911.

[15] Notably, plaintiffs do not address this prong in their brief in opposition. (See Doc. 68 at 12.)

vulnerable to harm—particularly the harm at issue here—merely by virtue of his attending school.  See Mohammed v. Sch. Dist. of Phila., 355 F. Supp. 2d 779, 786 (E.D. Pa. 2005) ("The evidence cited by Plaintiff cannot prove that Defendants' actions created the foreseeable risk that [he] would suffer the harm he suffered here."); cf. Kneipp, 95 F.3d at 1209 (finding that a reasonable jury could conclude that plaintiff satisfied the fourth prong because "[t]he conduct of the police . . . [in] sending her home unescorted in a seriously intoxicated state in cold weather, made [plaintiff] more vulnerable to harm. . . . A jury could find that [plaintiff] was in a worse position after the police intervened than she would have been if they had not done so.").  Accordingly, a reasonable jury could not conclude that the School District used its authority to create an opportunity for harm that would not otherwise have existed.

Because plaintiffs cannot demonstrate that the ultimate harm to Jaquan was foreseeable or fairly direct, that the School District acted in willful disregard for the Jaquan's safety, or that the School District used its authority to create an opportunity for harm that otherwise would not have existed, a reasonable jury could not find that the state-created danger exception applies.

2.     **Special Relationship Exception**

Under the special relationship exception to the general rule that a state is

under no obligation to protect citizens from private harms,

> [i]t is the State's *affirmative act of restraining the individual's freedom
> to act on his own behalf*—through incarceration, institutionalization, or
> other similar restraint of personal liberty—which is the "deprivation of
> liberty" triggering the protections of the Due Process Clause, not its
> failure to act to protect his liberty interests against harms inflicted by
> other means.

D.R. v. Middle Bucks Area Vocational Technical Sch., 972 F.2d 1364, 1370 (3d Cir.

1992) (quoting DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189,

200 (1989)); see also Susavage v. Bucks County Sch. Intermediate Unit No. 22, No.

Civ.A. 00-6217, 2002 WL 109615, at * 9 (E.D. Pa. Jan. 22, 2002) (providing that a state

actor has an "affirmative duty to protect citizens from private harm . . . . when it

takes physical custody of a person or otherwise prevents him from helping

himself.").  This affirmative duty "arises from 'the limitations which [the state] has

imposed on [the person's] freedom to act on his own behalf . . . [and] is breached

where the state, 'under sufficiently culpable circumstances, [fails] to protect the

health and safety of the citizen.'"  Id. (citing DeShaney, 489 U.S. at 190 and D.R.,

972 F.2d at 1369).  Importantly, a state actor must act with "deliberate indifference"

for this exception to apply.[16]  Id. (citing Nicini v. Morra, 212 F.3d 798 (3d Cir. 2000)).

Public schools and their students generally do not have a special relationship

because, despite their attendance in school, the students remain in the custody and

---

[16] See supra note 12.

13

control of their parents.  See Black v. Ind. Area Sch. Dist., 985 F.2d 707,713-14 (3d

Cir. 1993); D.R., 972 F.2d at 1369-72.  The Allens cite to a district court opinion for

the proposition that a special relationship exists between a school and a special

needs student.  See Susavage, 2002 WL 109615, at *12.  The court is unpersuaded

and finds this non-controlling case factually distinguishable from the matter *sub

judice*.  The Susavage student suffered from a generalized seizure disorder and

related musculo-skeletal problems that prevented her from sitting upright.  Id. at

*1-2.  The school arranged for a special harness on the bus to prevent the student

from sliding off of the seat.  Id. at *2.  Tragically, while riding on the bus, the

student was strangled by the harness, the very device that was intended to ensure

her safety.  Id.  The Susavage court found that, because the student "lacked the

capacity to help herself once she was restrained by the harness," and her parents

lacked the ability to provide alternate means of transportation, a reasonable jury

could conclude that the school "elected to physically restrain [the student's]

personal liberty on the bus, giving her no reasonable means of self-protection and

thus triggering an affirmative constitutional duty to protect her during the

transport."  Id. at *12.

    Unlike the Susavage student, Jaquan did not suffer a debilitating physical

condition requiring the School District to exercise control over him.  Nor did the

School District attempt to restrain Jaquan's liberty.  Further, despite the Allens'

contentions to the contrary, the evidence of record does not demonstrate that

Jaquan's emotional disability hindered his ability to care for himself.[17]  Jaquan was

a resource-level, special needs student who was mainstreamed into classes with

non-special needs students for part of the school day.  The Allens approved this

level of emotional support and recognized that it was less restrictive than Jaquan's

previous part-time level.  In addition, Jaquan had a means to help himself while in

school—he could, and did, handle his problems by going to the emotional support

classroom.  Accordingly, a reasonable jury could not conclude that the school

restrained Jaquan or prevented him from helping himself, thereby creating a

special relationship between Jaquan and the School District.  Hence, the special

relationship exception does not apply.

Because neither the state-created danger nor the special relationship

exception apply to the matter *sub judice*, the court will grant summary judgment in

favor of the School District on these Fourteenth Amendment claims.

---

[17] Plaintiffs' assertion that Jaquan was a "full time emotional support" student at the time of his death (see, e.g., Doc. 68 at 10) is without evidentiary support.  (See Doc. 68, Ex. 5 at 12; Doc. 41, Ex. 3.)

**B.      Claims under the IDEA, the Rehabilitation Act, and the ADA**[18]

The Allens claim that the School District violated the IDEA, § 504 of the

Rehabilitation Act, and the ADA, by failing to monitor Jaquan's movements

throughout the school at all times.

The IDEA, § 504 of the Rehabilitation Act, and the ADA are statutes that

protect the rights of disabled individuals.  The IDEA was enacted "to ensure that all

children with disabilities have available to them a free appropriate public education

that emphasizes special education and related services designed to meet their

unique needs."  20 U.S.C. § 1400(d)(1)(A).  It requires states to provide disabled

children with a "free appropriate public education" ("FAPE").  Id. § 1412(a)(1);

Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 9 (1993).  States must offer

"educational instruction specially designed to meet the unique needs of the

handicapped child, supported by such services as are necessary to permit the child

---

[18] The School District offers a purported expert report (Doc. 69, Ex. 2) from
an independent special education consultant to demonstrate that it acted in
compliance with the IDEA, the Rehabilitation Act, and the ADA.  However, the
School District does not offer an affidavit from the alleged expert.  The court cannot
consider this unsworn report by an alleged expert on a motion for summary
judgment.  See Fowle v. C & C Cola, 868 F.2d 59, 67 (3d Cir. 1989) ("The substance
of this report was not sworn to by the alleged expert.  Therefore, the [expert] report
is not competent to be considered on a motion for summary judgment."); see also
FED. R. CIV. P. 56(e).  The court will evaluate the claims under the IDEA, the
Rehabilitation Act, and the ADA without reference to the purported expert report.

to 'benefit' from the instruction."[19]  Bd. of Educ. v. Rowley, 458 U.S. 176, 188-89

(1982); see also 20 U.S.C. § 1401(9).  The program of education offered to the student

does not have to be the best available, but must "confer some educational benefit."

Rowley, 485 U.S. at 200.  To this end, a state must conduct "a full and individual

initial evaluation" of the child, and develop an Individualized Education Plan

("IEP") before implementation of any special education program.  20 U.S.C.

§ 1414(a)(1)(A).  An IEP is a detailed instruction plan tailored to address the child's

educational needs, and serves as the "primary mechanism" to ensure that a

disabled child receives a FAPE.  Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 756 (3d

Cir. 1995); see also 20 U.S.C. §§ 1401(14), 1414(d).  Importantly, an IEP must provide

for "significant learning" and confer a "meaningful benefit" to satisfy the

requirements of FAPE.  T.R. v. Kingwood Twp. Bd. of Educ., 205 F.3d 572, 577 (3d

Cir. 2000).  The "IDEA's central goal is that disabled students receive an

appropriate education, not merely an appropriate IEP."  Ridgewood Bd. of Educ. v.

N.E. ex rel. M.E., 172 F.3d 238, 250 (3d Cir. 1999).

　　　While the IDEA sets forth an affirmative duty to provide an appropriate

education to disabled students, § 504 of the Rehabilitation Act is a "negative

prohibition against disability discrimination in federally funded programs."  W.B. v.

Matula, 67 F.3d 484, 492 (3d Cir. 1995).  However, "[t]here appear to be few

---

　　　[19] "The term 'related services' means transportation, and such
developmental, corrective, and other supportive services . . . as may be required to
assist a child with a disability to benefit from special education . . . ."  20 U.S.C.
§ 1401(26).

differences, if any, between IDEA's affirmative duty and § 504's negative prohibition." Id. at 492-93; see also id. at 493 ("Indeed, the regulations implementing § 504 adopt the IDEA language, requiring that schools which receive or benefit from federal financial assistance 'shall provide a free appropriate public education to each qualified handicapped person . . . ." (citing 34 C.F.R. § 104.33(a))). To establish a violation of § 504, a plaintiff must demonstrate that: (1) the student was disabled, (2) the student was "otherwise qualified" to participate in school activities, (3) the school receives "federal funded assistance," and (4) the student was excluded from participation in, denied benefits of, or subjected to discrimination at the school.[20] Ridgewood Bd. of Educ., 172 F.3d at 253. A plaintiff need not demonstrate intentional discrimination. See id. A finding of "bad faith or gross misjudgment" will stand in its stead. See McKellar v. Commonwealth of Pa. Dep't of Educ., No. 98-CV-4161, 1999 WL 124381, at *5 (E.D. Pa. Feb. 23, 1999) (citing Monahan v. Nebraska, 687 F.2d 1164, 1171 (8th Cir. 1982)).[21]

Finally, the ADA is similar to the Rehabilitation Act, but it "extend[s] section 504's anti-discrimination principles to public entities." Helen L. v. DiDario, 46 F.3d 325, 332 (3d Cir. 1995); see also 42 U.S.C. § 12132 ("[N]o qualified individual with a

---

[20] The School District challenges only whether plaintiffs can satisfy the fourth element.

[21] But see O.F. ex rel. N.S. v. Chester Upland Sch. Dist., 246 F. Supp. 2d 409, 420 (E.D. Pa. 2002) (rejecting the school district's claim that the plaintiff "*must demonstrate* 'gross misjudgment or bad faith' on the part of school officials" and noting that the Third Circuit "did not adopt the 'gross misjudgment or bad faith' standard urged by [the school district]" (emphasis added)).

disability shall, by reason of such disability, be excluded from participation in or be

denied the benefits of the services, programs, or activities of a public entity, or be

subjected to discrimination by any such entity."). Like claims under § 504, claims

under the ADA do not require intentional discrimination; discriminatory effect can

be the basis for ADA claims. See Helen L., 46 F.3d at 331-32.

In the matter *sub judice*, a reasonable jury could not find Jaquan's IEP

insufficient or his education inappropriate for an IDEA claim to stand.[22]  The record

reflects that the School District offered Jaquan an appropriate education based on

his specific needs. The Allens do not dispute that Jaquan was improving

behaviorally and academically while at Holtzman; Mrs. Allen approved each of his

---

[22] The Allens argue that there is a disputed issue of fact as to whether Jaquan
was covered by an IEP on the day of his death. Under the category "Anticipated
Duration of Services and Programs," the April 30, 2003 IEP indicates that an
evaluation report would be due on October 1, 2003. (Doc. 68, Ex. 5 at 3.) The Allens
assert that this date was the IEP's expiration date, and that Jaquan was not covered
by this IEP on the date of his death. The School District contends that the October
1 date was a clerical error, that an evaluation report was completed in August 2002,
and that these reports are done every three years. (Doc. 68, Ex. 4 at 25-27; Doc. 68,
Ex. 1 at 25-27.) Regardless of whether the IEP had technically expired, the parties
were clearly adhering to it at the time of Jaquan's death and, as discussed supra, it
was appropriate. Accordingly, a reasonable jury could not conclude that the School
District was providing an inappropriate education. See Ridgewood Bd. of Educ.,
172 F.3d at 250 ("[The] IDEA's central goal is that disabled students receive an
appropriate education, not merely an appropriate IEP.").

IEPs[23] and never raised concerns that the School District failed to address.[24]  Nor is there any evidence of a need for Jaquan's full-time monitoring.  The Allens never expressed a concern that Jaquan was a flight risk or that he needed an escort.  They were surprised by Jaquan's elopement from school grounds, and there is no evidence that Jaquan had ever run away from anywhere.  Further, the Allens' attempt to equate the goal "remain in designated areas" with a known or foreseeable flight risk is without evidentiary support.  It is undisputed that this goal involved Jaquan remaining on task.

Nor is the evidence of record sufficient for a reasonable jury to find that the School District violated § 504 or the ADA.  The record is devoid of any suggestion that Jaquan was treated differently because of his emotional disability.  A reasonable jury could not conclude that Jaquan was excluded from participation in,

---

[23] In her deposition testimony, Mrs. Allen acknowledged that she understood that Jaquan's most recent placement at the resource level of emotional support was a less restrictive placement than his previous one.  (Doc. 41, Ex. 4 at 73.)

[24] The Allens' efforts to challenge Jaquan's in-school supervision, based solely on the opinions of his former foster care coordinator, are unavailing.  The foster care coordinator's professional relationship with Jaquan, and her official dealings with the Special Education Department at the School District, terminated when Jaquan was adopted in February 2002.  (Doc. 68, Ex. 10 at 38-39.)  Her responsibilities for Jaquan ended approximately five months before Jaquan's emotional support level improved from full time to part time and over one year before it improved to the resource level.  The foster care coordinator's opinion that the school should have monitored Jaquan while in school was based on her erroneous assumption that he was a "full-time emotional support" student. (Doc. 68, Ex. 10 at 93-94); see supra note 17.

denied benefits of, or subjected to discrimination, gross misjudgment, or bad faith
at the school.

    While tragic, Jaquan's elopement from school and fatal accident were not the
result of an inappropriate education or of any discrimination, bad faith, or gross
misjudgment.  Because a reasonable jury could not conclude that the School
District provided an inappropriate education to Jaquan or discriminated against
him because of his disability, the court will grant summary judgment in favor of the
School District on the IDEA, Rehabilitation Act, and ADA claims.

## IV.   <u>Conclusion</u>

    A review of the allegations of the complaint and evidence of record reveals
that plaintiffs cannot establish violations of the Fourteenth Amendment, the IDEA,
§ 504 of the Rehabilitation Act, or the ADA.  Accordingly, defendant's motion for
summary judgment on these claims will be granted.[25]

---

[25] Plaintiffs also bring a Fourteenth Amendment substantive due process
claim for the termination of their rights of companionship and association with
their adopted child.  (Doc. 1 ¶ 45.)  Because the court finds that the School District's
conduct was not unconstitutional under the Fourteenth Amendment and did not
violate the IDEA, the Rehabilitation Act, or the ADA, this claim cannot stand.  <u>See</u>
<u>Agresta v. Sambor</u>, 687 F. Supp. 162, 167 (E.D. Pa. 1988) (stating that the parents'
action for the termination of their right of companionship is based on the
unconstitutional actions of the defendant); <u>see also</u> <u>Susavage</u>, 2002 WL 109615, at
*15 (finding that the alleged violations of the IDEA, the Rehabilitation Act, and the
ADA supported a cause of action for the termination of the parents' rights of
companionship and association).  Accordingly, the court will grant summary
judgment in favor of the School District on this claim.

An appropriate order will issue.

                                              __/s/ Christopher C. Conner___
                                              CHRISTOPHER C. CONNER
                                              United States District Judge

Dated:        April 21, 2006

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **FRANK ALLEN and MARIE ALLEN,** | : | **CIVIL ACTION NO. 1:04-CV-2297** |
| | : | |
| **Plaintiffs** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **SUSQUEHANNA TOWNSHIP** | : | |
| **SCHOOL DISTRICT,** | : | |
| | : | |
| **Defendant** | : | |

## ORDER

AND NOW, this 21st day of April, 2006, upon consideration of defendant's

motion for summary judgment (Doc. 40), and for the reasons set forth in the

accompanying memorandum, it is hereby ORDERED that:

1.    The motion for summary judgment (Doc. 40) is GRANTED.

2.    The Clerk of Court is directed to enter JUDGMENT in favor of
      defendant Susquehanna Township School District and against
      plaintiffs Frank Allen and Marie Allen on all claims.

3.    The Clerk of Court is directed to CLOSE this case.


                                    __/s/ Christopher C. Conner___
                                    CHRISTOPHER C. CONNER
                                    United States District Judge